WILLIAM M. MCINNES, executor, *vs.* CONSTANCE WHITMAN & others.

Middlesex.    November 4, 1941. — January 25, 1943.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & RONAN, JJ.

*Executor and Administrator*, Debts of estate, Payment of legacies, Executor acting as trustee. *Minor. Trust*, Who can act as trustee, Investments, Trustee's compensation, Trustee's accounts. *Interest.*

An attack by certain ultimate beneficiaries of a decedent's estate upon delay by the executor for several years in paying a debt of the estate was without merit where it appeared that the delay was advantageous to such beneficiaries in that thereby the executor was enabled to use in part for such payment currently accruing dividends to which other beneficiaries, who made no objection, were entitled, instead of capital.

An executor of a will including a legacy to a minor who had no guardian was under no duty to seek to have a guardian appointed and was not chargeable for a delay in payment of the legacy for several years during which there was no guardian.

The fact, that the mother of a minor beneficiary of a trust having no guardian consented to the trustee's retention of improper investments, did not preclude the beneficiary from attacking such retention although, knowing that he had an interest in the trust, he had "looked upon" his mother as his "representative in dealing with" the trustee.

An adult beneficiary of a trust who, with full knowledge of the facts and of his rights, consented to the trustee's retention of improper investments was not entitled to have him charged therefor.

An executor, who administered a trust following declination of the trustee named in the will, was under the same duty respecting the investments of the trust as he would have been under had he been duly appointed trustee by the Probate Court.

On the facts, an executor who also administered a trust created by the will was not chargeable for loss resulting from retention for one year after his appointment in March, 1930, of securities received from the testator which were not proper trust investments and were constantly declining in value, but he was chargeable for the amount by which they declined in value after the date of the expiration of that year.

Beneficiaries of a trust who had procured the charging of the trustee for loss sustained through retention of improper investments, but who would not have been entitled to the income on the sum for which the trustee was charged until the death of another beneficiary, were entitled to interest on that sum only from the date of the death of that beneficiary.

No error of law appeared in the allowance of reasonable compensation to a trustee who, although chargeable for loss sustained through retention of improper investments, was not shown not to have acted in good faith.

The proper time for consideration of the matter of allowances to a trustee and his counsel for services in connection with hearings in a contest of the accounts of the trustee would be upon a subsequent accounting.

PETITION for the allowance of accounts filed in the Probate Court for the county of Middlesex.

The grandchildren of Henry S. Milton, and John W. Teele, "Trustee and Guardian," appealed from decrees by *Leggat*, J., allowing the accounts.

The stocks which, as stated in the opinion, the auditor found to be "improper" investments for trust funds were the following: 10 shares "American & London & Empire preferred"; 10 shares "American & London & Empire participating"; 170 shares "American Pneumatic common"; 50 shares "Bellanca"; 100 shares "Calumet & Hecla"; 30 shares "Cuba Cane Sugar preferred"; 10 shares "Cuba Cane Sugar common"; 47 shares "Cuba Cane Sugar subscription warrants"; 22 shares "Empire Public Service Corp. Class A"; 4 shares "Empire Public Service Corp. Class B"; 8 shares "Gosnold Mills"; 204 shares "Quincy Mining"; 50 shares "Seneca Mining"; 50 shares "South American Gold & Platinum"; 100 shares "Creole Petroleum"; 100 shares "Mohawk Mining."

As to the "American & London & Empire" stock, the auditor found that its value on April 1, 1931, was $350; and that it was "exchanged" for "Standard Investment Corp." stock. This "Standard Investment Corp." stock was one of the securities listed by the accountant in Schedule B of his second account as "held to be turned over to" the trustee Teele "upon the allowance of" that account "subject to further expenses," and its value was stated in

that account to be $356.16. There was no finding as to the value of the "Standard Investment Corp." stock. The court holds that those items should have been set forth in Schedule C, and that their value must "await a further accounting."

The auditor found that the "Bellanca" and the "Creole Petroleum" stocks were sold at a price above the inventoried value.

As to the remaining stocks in the foregoing list, the following facts were found:

The "American Pneumatic common" stock was valued on April 1, 1931, at $510. On the principle set forth in the opinion, therefore, the accountant was held to account for this security at that value. His accounts showed that he sold it for $59.82. He therefore should be charged on this item with $510 less $59.82, or $450.18.

The value of "Calumet & Hecla" stock on April 1, 1931, was $875, which was the value as to which the accountant was accountable under this decision. The trustee immediately sold this stock for $698, so that the accountant was chargeable on this item with $875 less $698, or $177.

The value of the "Cuba Cane Sugar preferred" stock on April 1, 1931, was $104. The accountant admitted a total loss. He therefore was chargeable with $104 on that item. There also was a total loss of "Empire Public Service Corp." stock, valued on April 1, 1931, at $104.50, and that was the amount for which the accountant was chargeable on that item.

The value of the "Gosnold Mills" stock on April 1, 1931, was $104. The trustee sold it for $38.96. The accountant therefore was chargeable on that item with $104 less $38.96, or $65.04.

The value of the "Quincy Mining" stock on April 1, 1931, was $1,632. On each of the dates August 1, 1932, and June 1, 1933, the accountant paid an assessment of $102 on this stock; and in 1935 it was forfeited for failure to pay a third assessment. On this item, therefore, the accountant was chargeable with $1,632 plus $204, or $1,836.

The value of the "Seneca Mining" stock on April 1, 1931,

was $62.50. Because of receivership proceedings, the accountant was chargeable with that as a loss.

The value of the "South American Gold & Platinum" stock on April 1, 1931, was $150. The trustee immediately sold it for $95.25. The loss, therefore, with which the accountant was chargeable was $150 less $95.25, or $54.75.

The value of the "Mohawk Mining" stock on April 1, 1931, was $1,900. The succeeding trustee, immediately upon receiving it, sold it for $1,357.46. The loss for which the accountant was held chargeable, therefore, was $1,900 less $1,357.46, or $542.54.

The losses shown by the foregoing facts on the "improper" investments, so far as ascertainable on the present record, therefore, were: "American Pneumatic common," $450.18; "Calumet & Hecla," $177; "Cuba Cane Sugar," $104; "Empire Public Service," $104.50; "Gosnold Mills," $65.04; "Quincy Mining," $1,836; "Seneca Mining," $62.50; "South American Gold & Platinum," $54.75; "Mohawk Mining," $542.54 — a total of $3,396.51, which is the amount stated in the opinion, and the loss as to the "American & London & Empire" stock, if any, was left to "await a further accounting."

*A. P. Teele,* for the respondents.

*J. J. Higgins,* for the petitioner.

DOLAN, J. These are appeals from decrees allowing the first and second accounts of William M. McInnes as executor of the will of Henry S. Milton. The second account is erroneously described as the second "& final" account, a balance still being shown in schedule B as in the hands of the accountant.

The accounts were referred to an auditor, and it was agreed that his findings of fact should be final. Material facts found by the auditor may be summarized as follows: The testator died on February 28, 1930, leaving an estate consisting solely of personal property, and represented for the most part by shares of stock. The property was appraised at the value of $94,114.24. The testator's heirs at law were his widow, and his daughter Alice (hereinafter called Mrs. Smith). The latter had five children, Kilby and

Constance of age when the testator died, Anne, Priscilla and Sarah who were then minors. They were the only grandchildren of the testator. He bequeathed one hundred shares of the common stock of the D. & L. Slade Company to Mrs. Smith, and ten shares to each of his grandchildren. The testator had been president of that company, the stock of which was closely held. Dividends of seven per cent annually were paid regularly on its preferred stock, and dividends of at least eight per cent per annum on the common stock were also paid regularly. Extra dividends of four per cent were paid at times on the common stock. The testator owned two hundred one of the shares of common stock at the time of his death, of which eighty-seven shares were pledged with other stocks as security for the payment of notes due to a trust company upon which there was due $13,500 at that time.

The testator gave the residue of his estate to Mrs. Smith, but in trust, to pay to his widow so much of the net income and principal as might be needed for her comfortable support during her life, and upon her death to pay the income to herself (Mrs. Smith). He provided that upon her death the income should be paid to his grandchildren, in equal shares, until the youngest of them reached the age of twenty-one years, at which time the trust fund was to be distributed equally among those living. Provision was made for the issue of any of the grandchildren who might die before that time.

The accountant qualified as executor of the will on March 28, 1930. The "cash assets" of the estate totalled $6,590.77. They were insufficient to pay the debts of the deceased and other obligations arising out of the settlement of the estate. The legacies of shares of stock of the Slade company could not be paid without withdrawing certain of the shares of that company from those pledged as collateral to the trust company. At the request of Mrs. Smith, her son Kilby and her daughter Constance, those legacies were not paid for the time being, and the dividends thereon were applied from time to time in part satisfaction of the notes held by the trust company. Other payments

were made from time to time by the accountant from the proceeds of sales of some securities, always at the direction of Mrs. Smith, who was named trustee but who never, qualified, being unwilling to do so. In the meantime the executor carried on at her request and with the consent of Kilby and Constance. Final payment was made to the trust company on January 15, 1937. In satisfaction of the notes the accountant had paid $9,131.53 out of the proceeds of principal of the estate, and $4,368.47 out of income. Interest payments on account of the debt were made by the accountant to the amount of $2,300.63.

The auditor also found that certain stocks left by the testator were "improper" investments for trust funds, and annexed to his report a table showing the dealings with these securities. Among them were certain mining stocks. The report discloses that with one or two exceptions where sales were made a year or two after the qualification of the accountant, these improper investments were not disposed of until 1938, or had been lost by nonpayment of assessments. Some were turned over to a trustee later appointed. Others are still in the hands of the accountant. The auditor set forth the inventory value, and the market value of these stocks as of two dates, namely, June 1, 1930, and April 1, 1931. The auditor found, however, that until the death of Mrs. Smith, the accountant had acted throughout in the matter of retaining or selling these securities at the request of Mrs. Smith; that her son Kilby was "as fully informed as his mother with respect to the manner in which the estate was being settled and fully consented to all that . . . [she] and the executor did in respect to it"; that Constance, who lived in New York but who visited her mother frequently, knew the terms of the will, why the estate was being kept open, that her legacy and dividends were withheld for a time, and consented to all her mother did and "considered . . . [her] as her representative in respect to the affairs of the estate and in dealing with the executor." The auditor found with relation to Anne, Priscilla and Sarah that "there is no evidence that their knowledge went any *further* than that there was an estate left by

their grandfather and that they received money from it. They looked upon their mother as their representative in dealing with the executor." Anne came of age a few months after the testator died. Priscilla was then thirteen years of age, and Sarah was eleven years of age. No guardian was ever appointed of their person or estate until one Teele was so appointed in the cases of Priscilla and Sarah in July, 1937. Both are now of age.

The accountant made payments of income to the widow of the deceased from April 25, 1930, down to the time of her death on June 30, 1936, in amounts fixed by Mrs. Smith. Thereafter he made payments of income to Mrs. Smith. Mrs. Smith died on March 16, 1938. The legacies of the Slade company stock had been satisfied, together with the dividends that had been declared thereon, except those to Priscilla and Sarah, which were later delivered and otherwise satisfied. The accountant still held unsold the greater part of the securities originally listed in the inventory, including some of those found to be improper investments. Some of these latter investments he sold, others he turned over to Teele, who was appointed trustee under the will on April 12, 1938. Teele immediately sold certain securities which the auditor has held to be improper investments for trust funds at a price which has been taken into account in determining the loss through those investments. Schedule B of the accountant's second account shows certain property still in his hands and noted as "Held to be turned over to John W. Teele, trustee upon the allowance of this account subject to further expenses." The items which follow this recital consist of certain shares of stock and a deposit in a trust company. They should have been set forth in schedule C as in the hands of the accountant. Until disposition of the securities listed, which appear to be carried at inventory value, it cannot be determined whether in connection therewith the accountant is to be charged with loss. Any question concerning those investments must await a further accounting.

The appellants contend that it was the duty of the accountant to satisfy the debts of the deceased within the

year allowed for the settlement of the estate by an executor, and attack his conduct with relation to the deferred satisfaction of the debt due to the trust company. The answer to this is that his conduct in that respect was not prejudicial to the interests of the appellants, but profitable to them since that debt was paid in part, as to principal, out of income to which the income takers were entitled, and as to interest thereon out of income also. No representative of either of the income takers, the widow and Mrs. Smith, has appeared to object. The result is that the appellants profit by the conduct complained of.

The appellants also contend that the conduct of the accountant in delaying to satisfy the legacies of the Slade stock to them was prejudicial. So far as appears, however, these legacies were ultimately satisfied. The adult persons to whom they were delivered together with the dividends which had been declared thereon are not shown to have demurred. Indeed, the legatee Kilby, after receiving his legacy, sold his shares of the Slade company stock to the accountant for the purposes of the trust estate. Until the appointment of a legal guardian of the minor legatees there was no one to whom the accountant could have made delivery and payment properly. He was under no duty, if indeed he would have had any standing in the lifetime of Mrs. Smith, to seek the appointment of a guardian of the minors. Delivery and payment were made to their legal guardian following his appointment. We see no reason for surcharging the accountant with respect to the legacies in question.

The auditor, at the request of the respondents, appended to his report the evidence upon which he based his findings to the effect that the accountant dealt with the investments left by the testator in accordance with the request of Mrs. Smith, and with the consent of Kilby and Constance, and that the minor children looked upon their mother as their representative with respect to the affairs of the estate. (See Rules 21, 32 of the Probate Court [1934], which are practically identical with Rules 89, 90 of the Superior Court [1932], and note that *Spilios* v. *Papps*, 288 Mass. 23, 27, was decided before the adoption by the Probate

Courts of Rule 89 and Rule 90 of the Superior Court.) We are of opinion that the evidence was admissible to show that the accountant, in pursuing the conduct complained of, acted upon the request of Mrs. Smith and with the consent of Kilby and Constance. But we think that the evidence of the purported representation of Anne, Priscilla and Sarah by their mother, as found by the auditor, was not admissible to affect their interests (*Bennett* v. *Pierce*, 188 Mass. 186, 189; *Ball* v. *Hopkins*, 268 Mass. 260, 267), with which we will deal hereinafter. The findings of the auditor do not support a conclusion that Anne, who became of age shortly after the testator died, consented to the conduct complained of. We are also of opinion that the findings of the auditor with reference to the conduct of Teele after his appointment as guardian of Priscilla and Sarah in 1937, and in particular his relations, in that capacity, with the accountant, do not justify a conclusion that the guardian consented to anything of which complaint is now made.

The respondents further contend that there was no valid excuse for the delay by the accountant in settling the estate of the deceased, that it was his duty to convert the improper investments into cash within a reasonable time, and that he is chargeable with the loss sustained as a result of his failure to do so. With respect to the respondents Kilby and Constance, in view of what has already been said we think that they cannot be heard to complain. The findings of the auditor demonstrate that each of them being sui juris consented to the conduct of the accountant in retaining the securities in question, with full knowledge of the facts and of his rights. In this respect the case is governed by *Preble* v. *Greenleaf*, 180 Mass. 79, and is distinguishable from *Bennett* v. *Pierce*, 188 Mass. 186, 189, where the right insisted upon by the petitioner was not in existence when she consented to the account of the trustee. See 2 Scott, Trusts, § 216.3.

We have already pointed out that Anne, Priscilla and Sarah Smith are not barred from asserting their rights by the purported representation of their interests in the trust

estate by their mother, and we proceed to consider their contentions.

It is settled that, when an investment is not such as the court would sustain a trustee in making, it should not be allowed to continue, but should be converted. The rule is the same with respect to property that comes to the trustee from the testator, *Lannin* v. *Buckley*, 256 Mass. 78, 84, and where the trustee seeks to be allowed for a loss on an investment, he has the burden of proving that he has exercised reasonable prudence and judgment in making or retaining the investment. *Ashley* v. *Winkley*, 209 Mass. 509. *Creed* v. *McAleer*, 275 Mass. 353, 362. It is true that in the instant case the accountant was not named as trustee by the testator, that he never was appointed as trustee, and that ordinarily the only duty of an executor is to reduce the personal property of the testator to possession, to pay his debts and costs of administration, to pay legacies, and to close the estate as soon as is reasonably necessary. But it is settled where a trust is created by will, and no trustee is named, that at least the executor may rightly act as trustee until one is appointed by the court. *White* v. *Sawyer*, 13 Met. 546, 547. *Whiting* v. *Whiting*, 4 Gray, 236, 240. *White* v. *Massachusetts Institute of Technology*, 171 Mass. 84, 96. *Conant* v. *St. John*, 233 Mass. 547, 551. We think that this also applies where, as here, Mrs. Smith was named by the testator as trustee, but was unwilling to serve and never qualified, and must therefore be taken to have declined the trust, G. L. (Ter. Ed.) c. 205, § 8, and at her request and with the consent of other beneficiaries the accountant administered the trust almost until its termination. In those circumstances the accountant, for the purposes of the case, must be treated as being subject to the same duties to which he would have been subject had he been appointed trustee by the court. This being so he was under a duty to dispose of the improper investments within a reasonable time.

The question of what is a reasonable time is not free from difficulty, that is, in defining precisely in a given case the time beyond which the trustee can no longer retain the

improper investments without incurring personal liability for loss which occurs thereafter. We think that it cannot be said that the accountant did not act as a reasonably prudent man in retaining the securities in question during the year following his appointment (1930), which was allowed for the settlement of the estate of the testator. It is of common knowledge that a great depression in the value of securities had its beginning in 1929. *First National Bank of Boston* v. *Truesdale Hospital*, 288 Mass. 35, 46. The market was declining, and the auditor has found that the decline was rapid from the time of the death of the testator to July, 1930, and continued, though less sharply, for a long time thereafter, and that by the first of April, 1931, the total market value of the securities in the estate had fallen over thirty per cent from their original (inventory) value. The auditor has found, in substance, that during that year it was not settled that the accountant was to continue to administer the affairs of the estate generally. But at the expiration of the year following his appointment we think that it cannot be said rightly that the accountant was justified in continuing to hold the securities in question, improper for trust investment and constantly depreciating in value. As before noted, the auditor found the market value of the improper investments on two dates, June 1, 1930, and April 1, 1931, contrasting those values with the inventory value at which the accountant was chargeable, together with any profits and subject to be allowed for any loss not occasioned by his fault. G. L. (Ter. Ed.) c. 206, § 5. The first date as of which the auditor found the market values of the securities in question occurred about two months after the qualification of the accountant as executor. We have already indicated that that period could not be said properly to have been one within which the accountant should have disposed of them. The second date as of which the market values were found was three days after the expiration of the year following the accountant's qualification. In all the circumstances we think that the accountant should have disposed of the improper investments at least as of that date. The difficulty

of determining what is a reasonable time in which to convert improper trust investments, and the numerous factors to be taken into consideration in deciding the question, are illustrated in 2 Scott, Trusts, § 230.2. See also Am. Law Inst. Restatement: Trusts, § 231, comment c. It is unnecessary to speak in detail of the various considerations bearing on the question since they all are summed up in the long established principle of law in this Commonwealth that a trustee is "required to conduct himself faithfully and to exercise a sound discretion, and to be enlightened by observance as to how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of the capital." *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Society*, 293 Mass. 480, 485, and cases cited. Applying those principles to the present case, where it cannot be said, as in the case just cited (page 488), that the loss that has resulted was not due to the conduct of the accountant or the kind of investments involved, and where at no time could they be regarded as proper to retain for more than the time reasonably necessary to dispose of them, we think that the date of one year after the qualification of the accountant is a reasonable time to fix the then market value of the securities in question for the purposes of determining the loss for which the accountant is chargeable. Measured thus the total loss would be $3,396.51. The accountant is to be charged with three fifths of that sum ($2,037.91) to be designated as held for the benefit of Anne, Priscilla and Sarah Smith in equal shares. Since any income that would have been earned on that sum prior to the death of Mrs. Smith would have been payable to others than the respondents, simple interest thereon should be allowed only from the date of the death of Mrs. Smith to the date of the final decree after rescript, at the rate of four per cent per annum. *Edwards* v. *Edwards*, 183 Mass. 581. *Loring* v. *Thompson*, 184 Mass. 103.

In thus fixing the loss for which the accountant is to be charged we are not setting up any fixed, arbitrary rule to

the effect that in all circumstances a year is the reasonable time within which a fiduciary must dispose of investments not proper for trust funds at the inception of the trust, or which, once proper, later become improper for one reason or another. In some circumstances a year or any other fixed time might be too long a time to retain such investments; in other circumstances, too short a time to allow for their disposition. Each case must be considered on its own particular facts in accordance with long established principles, enunciated in *Harvard College* v. *Amory*, 9 Pick. 446, to which we adhere. Under those principles as stated in that case (page 465) it is recognized that trustees "are justly and uniformly considered·favorably, and . . . that they should not be held to make good, losses in the depreciation of stocks or the failure of capital itself, which they held in trust, provided they conduct themselves honestly and discreetly and carefully, according to the existing circumstances, in the discharge of their trusts." See *Green* v. *Crapo*, 181 Mass. 55. In the instant case it is to be observed that the securities in question consisted of mining stocks, wasting investments (see *Creed* v. *McAleer*, 275 Mass. 353), and of other holdings of a highly speculative nature improper for the investment of trust funds from the inception of the trust.

The respondents have argued that items of the second account showing payment of $1,200 to the accountant for his services and $350 to his counsel for legal services should not have been allowed. While that account covers only the period from November 1, 1938, to April 30, 1939, it appears from an examination of both accounts that the total charges of the accountant for his services covering the period from March 28, 1930, to April 30, 1939, approximated $2,500 or an average of about $300 annually, and that those contained in the first account were stated to be on "account." The allowance of the items in question rested largely in the discretion of the judge. There is nothing in the record to show that the accountant did not act in good faith throughout, and the auditor has found that the accuracy of his accounts was unquestioned. We think it cannot

be said properly that the compensation and expenses allowed are not reasonable. G. L. (Ter. Ed.) c. 206, § 16, as amended by St. 1941, c. 36. The accounts were allowed as filed, and hence the contention of the respondents in connection with the findings of the auditor bearing on the question of proper allowances to the accountant for his services and those of his counsel in the proceedings before him need not be discussed other than to say that the proper place for the consideration of those matters is upon subsequent accounting by the accountant. *Frost* v. *Hunter,* 312 Mass. 16, 22.

It will be simpler to provide for the adjustments made necessary by what we have said by making appropriate directions for modification of the decree entered by the judge allowing the second account. Accordingly, the decree entered upon the second account is to be modified by charging the accountant in schedule A with the loss on securities and interest as hereinbefore set forth, and by providing that the sums so charged shall be denoted as held for the benefit of Anne, Priscilla and Sarah Smith; by striking from schedule B the items recited to be held for transfer to the trustee Teele, subject to future expenses; by charging the accountant in schedule C with those items, together with the amount of loss and interest, just before referred to; and by making appropriate changes in the totals of the schedules of the account. As thus modified the decrees allowing the accounts are affirmed.

*Ordered accordingly.*